The undersigned have reviewed the Award based upon the record of the proceedings before the Deputy Commissioner.
The appealing party has shown good grounds to reconsider the evidence. However, upon careful reconsideration of the evidence, the undersigned reach the same facts and conclusions as those reached by the Deputy Commissioner with some minor technical modifications. Neither party here requested the Full Commission to receive further evidence or to rehear the parties or their representatives. The Full Commission, in their discretion, have determined that there are no good grounds in this case to receive further evidence or to rehear the parties or their representatives, as sufficient convincing evidence exists in the record to support their findings of fact, conclusions of law, and ultimate order.
Accordingly, the Full Commission find as fact and conclude as matters of law the following, which were entered into by the parties as
STIPULATIONS
1. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. An employer-employee relationship existed between plaintiff and defendant-employer at all relevant times.
3. The date of the onset of disability from the alleged occupational disease was October 12, 1992.
4. The average weekly wage of plaintiff shall be determined by a Form 22.
5. Defendant-employer is self insured.
6. The following documents were stipulated:
a. Medical records
1. Dr. James P. King (4 pp.)
2. Dr. Jack Dawson (9 pp.)
3. Dr. Hank Clay (6 pp.)
4. Dr. Walter Holloway (9 pp.)
5. Dr. Charles Wiley (62 pp.)
6. Agape-Onoma Psycological Center (7 pp.)
7. MSDS sheets (35 pp.)
8. Plaintiff's Exhibit #2 — Drawing of plaintiff's workplace at Tyson. This exhibit was utilized during the hearing, however it was not submitted with the remaining records and is presumed missing.
9. Plaintiff's Exhibit #3 — Allergy test by Dr. King (1 p.)
10. Tyson Foods Reports (34 pp.)
11. Defendant's Exhibit #2 — Plaintiff's answers to Defendant's First Set of Interrogatories and Request for Production. (11 pp.)
12. Defendant's Exhibit #3 — Test results of Dr. Morgan (1 p.)
13. Form 19 received by the Commission on June 30, 1993
* * * * * * * * * * *
The Full Commission adopt as their own all findings of fact found by the Deputy Commissioner, with minor technical modifications, as follows:
Based upon the competent and convincing evidence adduced at the hearing, the undersigned make the following additional
FINDINGS OF FACT
1. At the time of the initial hearing, plaintiff was a fifty year old male with a third grade education. Plaintiff is, for all practical purposes, illiterate and has a poor memory. Plaintiff has never received any vocational training.
2. Plaintiff commenced work with defendant-employer in 1971. He quit at one time but was rehired. Plaintiff stopped working at defendant-employer's on October 12, 1992, because he was ill. He has not worked since.
3. Plaintiff began work at defendant-employer's performing clean-up tasks. Until 1979 he worked in the refrigeration room. In 1981, plaintiff moved to a smaller room, called the Compression Room, where he worked until his departure in 1992.
4. The compressor room contained thirteen compressors and an open water tank (sump tank) which held between 2,000 and 3,000 gallons of water. Chemicals (algicides and bromicides) were stored in closed barrels in the compressor room. Each barrel had a 3/8 inch opening with a tube inserted into it. Algicides or bromicides were alternately deposited into the sump tank water on Wednesday mornings. On those days, a smell similar to that of a chlorinated swimming pool or industrial cleaning products emanated from the tank. Every other weekend, employees cleaned the sump tank. Early in plaintiff's employment in the compressor room, the sump tank was metal and required replacement periodically. At the current time, the sump tank is made of fiberglass.
5. Plaintiff's duties were to visually check the oil temperature and pressure on the gauges on the outside of the compressors. Plaintiff was not required to mix any chemicals or otherwise handle them. Rarely, plaintiff was involved in cleaning up nuisance leaks. Plaintiff had no contact with ammonia present in the closed system compressors. Plaintiff and other employees could detect an ammonia odor when oil was drained once a day from two or three of the compressors. The ammonia which emanated from the compressors was a vapor.
6. Defendant-employer checked ammonia air levels routinely. Ammonia levels directly over the oil buckets averaged thirty-five parts per million. However, within fifteen minutes the ammonia levels decreased to zero. The accepted OSHA TLV is thirty-five to fifty-five ppm over eight hours.
7. The compressor room contained an integrated ventilation system which had two exhaust fans with a CFM of 12,000 each and two coolers. The exhaust fans removed air in the room and cooled outside air brought in. Air in the compressor room was totally exchanged with outside air every 1.167 minutes. Dilution of ammonia or other chemicals in the air of the compressor room began immediately.
8. Plaintiff also was required to test the temperature of random chickens, three to four times a day and to check temperature gauges on the chiller. The water in the chillers was automatically chlorinated. The chillers acted to cool the birds from 90 degrees to 34 degrees in one hour. Plaintiff tested the temperature of the chickens as they moved on a conveyor belt from the chilling tanks to the packaging department. He was not required to touch the chlorinated water. The chickens are immediately packaged for sale after being chilled. Plaintiff went to the packaging department three or four times a day to check the temperature of random chicken livers and chicken gizzards. The packaging department contained no chemicals. Plaintiff was also required to check gauges on the ice maker and condensers located on the roof of the Tyson plant, several times a day. He had no contact with chemicals during this part of his work task. Plaintiff worked eight hours a day, but was not in the compressor room the whole time. Other duties, elsewhere in the plant, took up approximately three hours a day.
9. Plaintiff's testimony regarding his work and his illnesses was not credible or convincing based on his demeanor, conflicts in the testimony and other credible and convincing evidence of record. The undersigned defer to Deputy Commissioner Hoag's first-hand determination in this case based upon the record as a whole. For example, plaintiff asserted that his symptoms including headaches, nausea, tiredness, rashes and soreness as well as sleep difficulties began only in 1987. However, plaintiff's medical records from Tyson indicate plaintiff's numerous visits to the medical department beginning in 1971 and continuing through 1992. In 1972 plaintiff was treated in the medical department seven times for complaints of a rash on the back of his neck, headache, indigestion and backaches. In 1973 plaintiff presented to the medical department seven times complaining of a cold, injury to his right leg and bee stings. The visits to Tyson's medical department continued in 1974 when he was seen fourteen times complaining of a cold, nausea, backaches, indigestion and throat aches. In 1976 plaintiff was seen eighteen times complaining of indigestion, nausea, sour stomach, colds, backaches, stomach aches and neck pain. In 1977, plaintiff presented to the medical department twelve times and requested a different job location and hours because working around chicken blood made him queasy. In 1981 plaintiff was seen in the medical department three times for cold or sore throat and headache and four additional times. Visits to the medical department continued through the 1980's and up to 1992 when he was seen five times for sinuses and backache from a fall before stopping work in October.
10. When questioned about the numerous times he visited the medical department prior to 1979, plaintiff first refused to answer, and then attempted to take the Fifth Amendment.
11. Plaintiff's symptomology prior to 1992 is also revealed in the medical records of his family physician. Plaintiff's family doctor in the 1980's and early 1990's was Jack Dawson. Plaintiff initially presented to Dr. Dawson complaining of flu like symptoms, of being tired and run down, having sick spells, nausea and stomach pain. Dr. Dawson diagnosed plaintiff with chronic anxiety and gastrointestinal problems. In 1986, plaintiff reported that strong odors from chemicals used on Wednesday caused him to have symptoms on Saturday. Dr. Dawson diagnosed a flu like syndrome. The doctor did not find plaintiff suffering from the effects of chemicals. In 1990, plaintiff presented numerous times to Dr. Dawson complaining of stomach, back pain and problems with his nerves and arthritis. During this time plaintiff was involved in a divorce proceeding with his wife and was drinking alcohol, as noted by the doctor. Dr. Dawson diagnosed plaintiff as having epigastric and pyloric problems as well as tendonitis of the right shoulder. In 1992, plaintiff presented to Dr. Dawson with nausea, allergies and claimed exposure to ammonia gas.
12. Plaintiff was involved in two head-on motor vehicle accidents in 1991. He presented to Dr. Holloway, who treated him for complaints of low back, neck, shoulders, sore joints and muscles in his neck and arm. Dr. Holloway diagnosed plaintiff as having degenerative joint disease, arthrosis, scoliosis, ankylosing, spondylosis and disc bulges.
13. Plaintiff was treated by Dr. Hank Clay from late 1991 through April 14, 1992. Dr. Clay diagnosed plaintiff as having depression, as well as arthritis and referred him to a rheumatologist.
14. Dr. Brown, a rheumatologist, diagnosed plaintiff as having tendinitis, lumbar strain and blood in his urine.
15. In January 1992, plaintiff presented to Dr. James E. King with allergies. Dr. King found plaintiff's problems might be psychogenic. He tested plaintiff for a variety of different agents. Plaintiff demonstrated a marked sensitivity to formaldehyde. Dr. King did not test plaintiff for any of the chemicals listed on the Tyson MSDS sheets, as being present in the plant. Nor did the doctor ever request samples of the chemicals present at defendant-employer's plant.
16. In June, 1992, plaintiff presented to Dr. James S. Morgan, a gastroenterologist. Dr. Morgan diagnosed plaintiff with a hiatal hernia, tertiary contractions, GI reflux, mild gastritis and pre-pyloric benign nodule. Dr. Morgan directed plaintiff to avoid tobacco, (Plaintiff smoked from one to two packs a day.), caffeine (Plaintiff had at least three cups a day.) and prescribed various medications including an antibiotic for the heliobacter pylori gastritis.
17. Beginning in August, 1992, plaintiff presented to Dr. Charles Wiley. Dr. Wiley is a specialist in family practice, allergy and nutrition. However, Dr. Wiley has had no formal training in any of these fields and practices holistic medicine, an alternative form of medicine. Dr. Wiley tests patients for the etiology of allergic symptoms in terms of inhalant or food allergy, yeast sensitivity and other contributing factors that he alleges encroach upon the immune system such as heavy metal toxicity and nutritional deficiency.
18. Plaintiff presented to Dr. Wiley with complaints of headaches, sore muscles, fatigue, nausea, abdominal swelling, edema and rash. Plaintiff attributed his symptoms to his exposure to ammonia and chlorine on the job. Dr. Wiley diagnosed plaintiff as having chemical toxicity, chronic fatigue, chronic myalgia, arthralgia, gastrointestinal bloating, headaches and symptoms of magnesium deficiency. He prescribed Nystatin powder to diminish the growth of yeast and Vermox to kill parasites. Due to the presence of copper plumbing in plaintiff's house, plaintiff underwent a hair and urinalysis to document the presence of copper and heavy metals. Dr. Wiley, additionally after the tests, diagnosed plaintiff as having heavy metal toxicity, chronic fatigue syndrome, gastritis, hypothyroidism and chemical toxicity. He prescribed Cortisone Acetate and thyroid supplements as well as Ativan and Phenergan. Dr. Wiley also prescribed Cuprimine because the urinalysis demonstrated plaintiff had a 40% increase of copper of the base line in his urine. Dr. Wiley did not administer tests to plaintiff which would have indicated intolerances or allergies.
19. In April, 1993, Dr. Wiley diagnosed plaintiff as having Wilson's syndrome, a liver syndrome, and an underactive thyroid. Thyroid supplements and steroids as well as the other medications which he had previously recommended were continued.
20. In 1994, Dr. Wiley diagnosed plaintiff as having mercury toxicity and APICA, a syndrome discovered by a holistic physician in California.
21. In 1994, Dr. Wiley diagnoses plaintiff as having Multiple Chemical Sensitivity ("MCS"), arthralgias, myalgia, and depression. Plaintiff continued to be treated throughout 1994 with thyroid supplements, cortisone and other medications. In 1995, Dr. Wiley diagnosed plaintiff as having chronic fatigue syndrome and prescribed the same medications listed above as well as a supplement to stimulate plaintiff's thymus gland.
22. Dr. Wiley's information about chemicals to which plaintiff may have been exposed came only from the patient, plaintiff's subjective history, and no objective knowledge.
23. Plaintiff's expert, Dr. Anthony V. Colucci, is a toxicologist who has never examined plaintiff. Dr. Colucci has not monitored for specific chemicals at Tyson, taken an exposure profile of plaintiff by measuring his chemical levels, or done a hazard evaluation to determine whether chemical exposure at Tyson was in sufficient concentration to cause harm. In addition, no risk assessment of plaintiff was done. Such an assessment utilizes mathematical statistical science to assess the probability that a person will develop a disease based on exposure. The profiles, evaluations and assessments are necessary in order to determine whether an individual has MCS.
24. Dr. Colucci never reviewed any industrial hygiene data from Tyson or visited the plant. He had no objective evidence regarding the concentration of chemicals used at Tyson, the duration of plaintiff's exposure to chemicals or the length of time during which chemicals were utilized. Dr. Colucci was not aware of the type of ventilation system present at defendant-employer's plant.
25. Defendant's expert, Dr. John Bond has been a practicing surgeon for thirty-five years and has been involved in industrial medicine for thirty years. Dr. Bond treated Tyson employees, including plaintiff, regularly during that time. At the request of defendants, Dr. Bond reviewed all of plaintiff's medical records, including his medical records at Tyson as well as the records of his care by other physicians such as, but not limited to, Dr. Wiley.
26. There is no intensification or progression of symptoms from 1971 to 1992. Plaintiff continued to have the same problems throughout the same time. Plaintiff's symptoms beginning prior to 1979, including headaches, nausea, backaches, indigestion, sick stomach, ulcers and shoulder pains are exactly the same symptoms experienced after 1979. Many of plaintiff's symptoms are consistent with depression. Plaintiff's back, shoulder and muscle aches were caused by motor vehicles accidents. In addition, lifting injuries, arthritis and falls contributed to various aches and pains of which plaintiff complained.
27. Plaintiff's gastrointestinal symptoms are consistent with those problems which have been verified by endoscopic examination and include hiatal hernia and heliobacter pylori gastritis. Plaintiff underwent an IFF performed by a gastroenterologist, which revealed an elevated heliobacter pylori titer.
28. Plaintiff's symptoms are also consistent with chronic fatigue syndrome. Nothing exists in scientific or medical literature relied on by people in the health care profession which indicates any connection between chronic fatigue syndrome and chemical exposure.
29. Additional symptoms of which plaintiff complained including malaise and anorexia are consistent with Wilson's Syndrome or could have come from copper plumbing located in plaintiff's home. Plaintiff had a poorly functioning thyroid gland although there is no indication in the medical records that plaintiff had hypothyroidism.
30. It is not standard practice in the medical community to prescribe steroids as Dr. Wiley did plaintiff without objective evidence that they are needed. Plaintiff did not have any symptoms which required steroids. Steroids can aggravate the stomach and are contraindicated in people with stomach problems. Librium, Ativan, Paxil and Phenergan, all of which Dr. Wiley prescribed for plaintiff, cause drowsiness. In addition, the combination of drugs, oral steroids and thyroid supplements can produce symptoms similar to those of which plaintiff complained.
31. Mainstream scientific and medical literature upon which health care providers rely, do not recognize the existence of MCS. MCS is a controversial diagnosis and is idiopathic. MCS is not acknowledged within the mainstream community although the diagnosis has been accepted by the ADA, HUD and Social Security Administration. Several toxicological studies regarding MCS have indicated that MCS contradicts fundamental principles of toxicology. Tests for MCS are often subjective and useless. There is no evidence that MCS occurs other than by mere chance. The positions of the American Academy of Allergy and Immunology, the Council on Scientific Affairs of The American Medical Association; and the California Medical Society on MCS are that the syndrome is unproven and there is no scientific evidence MCS is a significant cause of disease or that diagnostic tests and treatments for MCS have any therapeutic value.
32. It is not accepted practice in the medical community to diagnose and treat patients for alleged chemical intolerance or exposure without testing to determine if a problem exists. It would be speculation to attribute causation and symptoms to a chemical without the knowledge of the amount of the chemical exposure, time of exposure and levels of exposure.
33. Dr. Bond's testimony and his review of the medical literature are given more weight and credibility than the testimony of Dr. Wiley and Dr. Colucci. All three doctors agree, however, that MCS is not a diagnosis which exists in the mainstream of medicine and that it is a controversial diagnosis.
34. The greater weight of the competent, credible, and convincing evidence is that there is no sufficient causal relationship between plaintiff's multiple symptoms and his employment. Moreover, plaintiff has not sufficiently met his burden of proof that his employment with defendant-employer and his exposure to the limited amounts of ammonia, chlorine and other chemicals placed him at an increased risk from members of the population as a whole for having symptoms.
* * * * * * * * * * *
Based upon the findings of fact as found by the Deputy Commissioner and adopted by the Full Commission, the Full Commission find as follows:
CONCLUSIONS OF LAW
1. An occupational disease is defined as that which is the result of causes and conditions characteristic of and particular to a specific trade and not the result of diseases to which the general public is equally exposed outside of that specific trade. Plaintiff has the burden of proof with regard to each element. N.C. Gen. Stat. § 97-53(13). Gibbs v. Leggett andPlatt, Inc., 112 N.C. App. 103, 434 S.E.2d 653 (1993).
2. Plaintiff has failed to prove by the greater weight of the competent, credible, or convincing evidence that he is disabled as a result of an occupational disease characteristic of and peculiar to his occupation or employment with Tyson Foods. N.C. Gen. Stat. § 97-53(13).
3. Plaintiff has failed to prove by the greater weight of the competent, credible, or convincing evidence that his employment with Tyson and his limited exposure to small amounts of ammonia, chlorine, algicides, bromicides and other chemicals listed on MSDS sheets and present in the Compressor Room placed him at an increased risk from members of the general population. N.C. Gen. Stat. § 97-53(13).
4. The Commission is the sole judge of the credibility of the witnesses and the weight to be given to their testimony. It may accept or reject the testimony of a witness either in whole or in part, depending solely on whether it believes or disbelieves the same. Anderson v. Northwestern Motor Co., 233 N.C. 372,64 S.E.2d 265 (1951).
5. Plaintiff's testimony with regard to the basis of his exposure and the extent to which he was exposed to chemicals in his job at Tyson as well as when his symptoms were manifested is not considered credible or convincing to the undersigned.
6. In determining whether a claim is compensable, the Commission has the responsibility to weigh the evidence and to resolve all the conflicts in the testimony, whether medical or otherwise. These conflicts do not always have to be resolved in favor of a plaintiff. Cauble v. Mackie Co., 78 N.C. App. 793,338 S.E.2d 320 (1986). Greater weight is given to the expert testimony of Dr. Bond than to that of Dr. Wiley and Dr. Colucci due to its more convincing nature.
7. Expert witnesses may testify in the form of an Opinion, however, scientific knowledge must be trustworthy and scientifically valid. A theory, technique or diagnosis must be tested, subject to peer review and publication and be generally accepted in the relevant technical community. MCS is not a disease recognized by the technical and medical community.Daubert v. Merrell Dow Pharmaceuticals, Inc.,113 S.Ct. 2786, 2796-799, 125 L.Ed. 2d 469 (1993).
8. Plaintiff has failed to prove by the greater weight of the competent, credible, or convincing evidence that the medical conditions with which he has been diagnosed, including fibromyalgia, myalgia, Wilson's Syndrome, liver syndrome, hypothyroidism, heavy metal toxicity, endocrinopathy, hiatal hernia, heliobacter pylori gastritis, degenerative AC joint, lumbar spondylosis, arthritis of joints, lumbar strain, tendonitis, scoliosis, degenerative disc disease, allergies, chronic anxiety, ulcers, depression, yeast sensitivity, headaches, rashes, chronic fatigue syndrome, magnesium deficiency, parasites, leaky gut syndrome, mercury toxicity, inactive thymus, weak adrenal glands, APICA or MCS are characteristic of and peculiar to his employment at Tyson Foods. MCS is not an occupational disease within the meaning of N.C. Gen. Stat. § 97-53(13).
9. Since plaintiff has not sufficiently or convincingly proven that he suffered from an occupational disease, he is not entitled to compensation under the Workers' Compensation Act. N.C. Gen. Stat. § 97-53(13).
* * * * * * * * * * *
Based upon these conclusions of law, the Full Commission have determined there exists no basis for amending the Award. Accordingly, the foregoing stipulations, findings of fact, and conclusions of law engender the following:
ORDER
1. Plaintiff's claim is and hereby shall be DENIED.
2. Each side shall bear its own costs.
This case is ORDERED REMOVED from the Full Commission docket.
This the __________ day of ___________________, 1997.
 S/ __________________ J. HOWARD BUNN, JR. CHAIRMAN
CONCURRING:
S/ __________________ J. RANDOLPH WARD COMMISSIONER
S/ __________________ BERNADINE S. BALLANCE COMMISSIONER
JHB/nwm 01/02/97